IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL M. MELE | : | CIVIL ACTION |
|    *d/b/a Stanton Sales* | : | |
| | : | |
| v. | : | No. 09-0174 |
| | : | |
| TSE SYSTEMS, GMBH, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                      **May 27, 2010**

Defendant TSE Systems, Inc. (TSE) asks this Court for summary judgment against Plaintiff Samuel M. Mele. Mele's sole remaining claim in this action is for breach of contract. TSE argues if this Court interprets the contract's plain language and applies the parol evidence rule, Mele is precluded from recovery. This Court agrees the language of the contract bars Mele's claim for relief and will grant TSE's motion for summary judgment.

**FACTS**

Mele is an independent salesman and the sole proprietor of Stanton Sales, a business that contracts with manufacturers and distributors to sell medical and scientific supplies to universities and research laboratories. Mele brings claims against two defendants, TSE and TSE Systems, GmbH (TSE, GmbH).[1] TSE, GmbH is a German company which develops and manufactures animal testing equipment. TSE is a fully owned subsidiary of TSE, GmbH and distributes TSE, GmbH's products in North America.

On August 1, 2005, Mele, on behalf of Stanton Sales, signed a TSE Systems, Inc. Manufacturers' Representative Agreement (the Agreement) which appointed Stanton Sales as a "non-exclusive sales commission representative for Products in the Northeast and Southeast

---

[1] GmbH is an abbreviation for Gesellschaft mit beschrankter Haftung, which is the German equivalent of a limited liability company. *See A. Natterman & CIE GmbH v. Bayer Corp.*, 428 F. Supp. 2d 253, 259-60 (E.D. Pa. 2006).

territory."[2] Agreement at 1. As a non-exclusive sales commission representative, Mele agreed to "perform primarily as a sales and market development specialist, to promote sales growth of TSE products in the Territory and to be the primary, but not exclusive, interface with the customers for purposes of developing, securing, and servicing the sale of Product at accounts in the Territory."[3] Agreement at 4. The Agreement obligated TSE to instruct Mele regarding the features and technology of TSE, GmbH products, and to provide product information and price lists free of charge, provide the names of prospective accounts within the Territory, and technical support. *Id.*

TSE agreed to pay Stanton Sales a 10% commission of the net invoice value for all sales to accounts with a billing address within Stanton Sales's territory, provided Stanton Sales was "the primary or sole party responsible for achieving the sales."[4] Agreement at 2. The Agreement states Mele may be eligible for sales he made outside his territory and that those sales would be evaluated on a case-by-case basis.[5] The Agreement further states Mele would receive his commission following TSE's receipt of the customer's payment, and Mele would not receive a commission for orders placed after Mele's contract with TSE was terminated.

When TSE began its relationship with Stanton Sales, it also offered Mele a 5% commission for sales pending at the time of the Agreement, as an incentive for Mele to begin to develop client

---

[2] Addendum B to the Agreement further defines Mele's territory.

[3] The Territory at issue is the Northeast and Southeast region to which Mele was assigned.

[4] The net invoice value excludes "deductions of credits, returns, uncollected accounts and allowances." Agreement at 2.

[5] In the event a TSE sales Representative made a sale at a location in his own territory of products that would be shipped to another territory, the Agreement states that commissions may be split between Representatives of each territory, as determined on a case-by-case basis.

relationships. TSE credited Mele with a 5% commission on pending sales if Stanton Sales "contributed bona fide efforts to close the sale." Agreement at 3. This introductory commissions policy expired on March 31, 2006. *Id.* After this initial period, the Agreement states TSE would only pay commissions to a sales person who acted as the sole or primary agent on a sale.

The parties dispute Mele's successfulness as a representative of TSE products. TSE's President, Jim Marinik, testified that Mele, through Stanton Sales, was not a successful sales representative. Marinik contends Mele only created one new client relationship for TSE and that, instead of developing new clients, Mele would wait until TSE developed a client relationship and then try to add additional sales to those clients to earn his commissions. TSE further states it had trouble communicating with Mele, Mele did not take initiative as a salesperson or follow up on clients' requests, and Mele never became adequately knowledgeable about TSE's products. In August 2007, TSE hired Robert Tice as a Vice President of Sales and Market Development. Tice was charged with working with Mele to improve Stanton Sales's performance. Tice and Mele had a number of conflicts; most notably, Mele refused to follow the commissions reporting system TSE implemented.

The initial term of the Agreement was August 1, 2005, to March 31, 2006. The Agreement provided for 12-month contract extensions at the discretion of TSE.[6] TSE extended this Agreement twice. The Agreement stated TSE would give Mele 60 days notice, before the end of each fiscal year, of its intention to either extend or terminate the Agreement. With regard to renewing the Agreement for the term beginning April 1, 2008, TSE says its Board voted not to renew Stanton

---

[6] These optional 12-month extensions coincided with TSE's fiscal year, April 1 through March 31.

Sales's contract because of the hostile, unproductive relationship which developed between Mele and TSE. On January 28, 2008, TSE informed Mele that his Agreement would not be renewed and would formally terminate on March 31, 2008. This letter stated, Mele would "be paid commissions for any business you have been assigned and worked [on] and for which TSE has received a Purchase Order prior to the effective termination date of March 31, 2008, and for which TSE receives payment, per TSE's commission policy." Letter from Robert Tice and James Marinik to Sam Mele, Stanton Sales, January 24, 2008, Ex. 14 to Pl.'s Opp. to Summ. J.

Mele filed the instant lawsuit on January 13, 2009, bringing claims against TSE, GmbH for civil conspiracy, piercing the corporate veil, and intentional interference with business relations, and claims against TSE for breach of contract, intentional interference with business relations, fraud, civil conspiracy, piercing the corporate veil, and breach of the implied covenant of good faith and fair dealing. On March 23, 2009, TSE filed a motion to dismiss. On May 12, 2009, this Court granted TSE's motion to dismiss Counts II, IV, VI, and VII of the complaint.[7] On May 14, 2009, the Court amended its May 12, 2004 Order to include dismissal of Count V of Mele's complaint, as this Count was inadvertently omitted in the original order. On May 14, 2009, TSE, GmbH filed a motion to dismiss. On June 15, 2009, this Court dismissed Counts VI and VII for civil conspiracy and piercing the corporate veil against TSE, GmbH . Following disposition of these motions, Mele

---

[7] This Court held Mele could not maintain his claims for fraud, intentional interference with business relations, and civil conspiracy because his claims were based on a contractual duty between himself and TSE and were thus properly brought as contract, not tort, claims. Order of May 12, 2009, No. 09-174, Doc. 13. The Court further held, because the Agreement at issue is governed by Michigan law, Mele's claim that TSE breached an implied covenant of good faith and fair dealing could not stand because Michigan does not recognize such a claim. Finally, this Court dismissed Mele's "piercing the corporate veil" claim, as this doctrine is a means of imposing liability, and not a cause of action in itself. *Id*.

maintained claims against TSE for breach of contract and against TSE, GmbH for intentional interference with business relations. After the close of discovery, TSE and TSE, GmbH filed motions for summary judgment.[8]

**DISCUSSION**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Doe v. County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001). "Facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano*, 120 S. Ct. 2658, 2677 (2009) ; *see id.* ( "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (alterations and citations omitted).

---

[8] TSE, GmbH's summary judgment motion will be addressed in a separate opinion.

Mele contends TSE breached the Agreement by failing to provide sales leads, interfering with customer relations, and improperly implementing a new commissions reporting system. TSE argues that, even viewing all evidence in the light most favorable to Mele, Mele cannot succeed on his breach of contract claims because TSE did not breach the Agreement and Mele improperly asks this Court to consider parol evidence.

Both parties agree this Court should apply Michigan law in evaluating Mele's breach of contract claim. "Parties to a contract may select, in advance of litigation, the forum and the law under which their dispute will be settled." *Botman Int'l, B.V. v. Int'l Produce Imports, Inc.*, 205 Fed Appx. 937, 941 (3d Cir. 2006) (citations omitted). In the instant case, the Agreement contains a choice of law clause stating Michigan law governs interpretation of the Agreement. Accordingly, this Court shall apply Michigan law.

To recover for a breach of contract under Michigan law, a plaintiff must prove: "(1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) [the defendant] breached the contract, and (4) the breach caused [the plaintiff] injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999)). There is no dispute a contract existed between the parties. Instead, the parties dispute their obligations to each other under the Agreement.

Mele first claims he is entitled to commissions on three specific sales. First, he contends he is entitled to commission on a $150,000 sale to Merck & Co, because he was the initial point of contact for this sale. Mele states that, in February 2008, one month before his TSE contract ended, a Merck representative contacted him with a request for information about TSE equipment. Mele

6

advised TSE of Merck's request and offered his services in negotiating a contract with Merck. TSE apparently did not accept Mele's offer of assistance and Mele's involvement with the sale ended. Mele contends Merck's initial inquiry resulted in a $150,000 sale which was finalized within sixty days after his termination.[9] Second, Mele argues he is entitled to commission on a $150,000 sale to Novartis because he had previously sold Novartis TSE products. He does not assert he was personally involved in this sale. Third, Mele argues he is entitled to a ten percent commission on a $20 million sale to LAB Research because he identified LAB Research as a potential client in April 2007 and began to develop LAB Research as a customer thereafter. Mele argues he worked to develop this sale by providing drawings to LAB Research in January or February 2008. Mele asserts LAB Research eventually entered into a $20 million contract with TSE, and contends his efforts in relation to this sale entitle him to a commission. Mele does not dispute that the orders for all three sales were placed after his termination, nor does he suggest he was the sole or primary salesperson responsible for these three sales.

TSE asserts it has no obligation to pay Mele commission on any of these sales. First, TSE contends each of these sales was finalized after Mele's termination on March 31, 2008.[10] Second, TSE argues that, even if the sales were finalized while Mele was still a TSE Representative, he is not entitled to commission on such sales because he was not the sole or primary party responsible for the sale.

---

[9] Mele suggests TSE intentionally delayed finalizing this sale until after March 31, 2008, in order to deny Mele a commission on the sale.

[10] TSE contends the purchase orders for the sales at issue were submitted May 14, 2008, June 4, 2008, November 12, 2008, and December 5, 2008. Mele does not dispute the accuracy of these dates.

Under Michigan law, the "construction and interpretation of a contract present questions of law." *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 918 (Mich. Ct. App. 2006). To interpret the terms of a contract, a court must "read the agreement as a whole and attempt to apply the plain language of the contract itself." *Metal Partners, LLC v. L & W Corp.*, No. 06-14799, 2009 U.S. Dist. LEXIS 95544, at *14 (E.D. Mich. Oct. 13, 2009) (citing *Old Kent Bank v. Sobczak*, 620 N.W.2d 663 (Mich. Ct. App. 2000)). A court "does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998) (citations omitted).

Mele first asserts he is entitled to commissions which were completed within 90 days of the termination of the Agreement on March 31, 2008. TSE disputes this and argues the plain language of the contract states that TSE is not required to pay Mele commissions on any orders placed after Mele's termination.

Under the heading, "No Liability Upon Termination," the Agreement states:

> TSE shall have no obligation to pay Representative any commission on orders placed after the termination date of this Agreement. TSE shall pay Representative for all commissions earned up to and including the date of termination. TSE shall provide Representative with a written statement documenting commission payments to be paid to Representative based on sales that are expected to be completed within three months of the point of termination of this Agreement. However, TSE is only obligated to make the commission payments for cases in which the customer actually makes payment to TSE.

Agreement at 6. Mele argues there is an ambiguity in the following language: "TSE shall provide Representative with a written statement documenting commission payments to be paid to representative based upon sales that are expected to be completed within three months of the point of termination of this Agreement." Agreement at 6, ln. 3. Mele contends this language creates an

8

obligation for TSE to pay him commissions on sales expected to be completed within three months of March 31, 2008. TSE argues Mele's reading of the agreement is erroneous in light of the prior language which states "TSE shall have no obligation to pay Representative any commissions on orders placed after the termination date of this Agreement." Agreement at 6, ln. 1. TSE argues Line Three obligates TSE only to provide Mele with a list of sales with purchase orders submitted before Mele's termination, but for which TSE expected payment following Mele's termination.[11]

Terms of a contract are ambiguous only when the language is "reasonably susceptible to more than one interpretation." *Rinke v. Auto. Moulding Co.*, 573 N.W.2d 344, 346 (Mich. Ct. App. 1997) (citations omitted). "If no reasonable person could dispute the meaning of ordinary and plain contract language, the court must accept and enforce the language as written." *Encompass Ins., Inc. v. Hagerty Ins. Agency, Inc.*, No. 08-337, 2009 U.S. Dist. LEXIS 4113, at *34 (W.D. Mich. 2009) (citing *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005)). This Court finds the clause of the Agreement which states "TSE shall have no obligation to pay Representative any commissions on orders placed after the termination date of this Agreement," is abundantly clear. It reflects the intent of the parties that Mele's eligibility for commissions based on a client's submission of a purchase order would end on the day of his termination.

Line Three obligates TSE to "provide [the] Representative with a written statement." Agreement at 6. This plain language requires TSE to provide an accounting of completed sales, not

---

[11] TSE further argues that Mele is aware he is not entitled to commissions on orders placed after March 31, 2008, because he requested TSE give him a contract extension so he would remain eligible for commission on the Merck sale, a request which TSE denied.

remuneration for sales which were finalized following Mele's termination.[12] This Court is mindful that courts "should read [a] contract as a whole and give meaning to all the terms contained" within. *Century Sur. Co. v. Charron*, 583 N.W.2d 486, 488 (Mich. Ct. App. 1998). Furthermore, "courts must give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). If this Court accepted Mele's argument, it would render superfluous the Agreement's provision that "TSE shall have no obligation to pay Representative any commissions on orders placed after the termination date of this Agreement." Agreement at 6, ln. 1. In light of this clear prohibition against post-termination commission payments, this Court finds the language of the Agreement at issue is unambiguous. By the terms of the Agreement, TSE has no obligation to pay Mele commissions for the Merck & Co., Novartis, or LAB Research Sales, as all three sales were finalized following Mele's termination.[13]

Mele argues in the alternative that, if the terms of the Agreement do not obligate TSE to pay him commissions for sales in which purchase orders were placed within three months of his termination, this Court should still find TSE was obligated to pay such commissions because TSE's President, James Marinik, "agreed to put an extension of 3 months at the end of the contract." Affidavit of Sam Mele, No. 09-174, Ex. 2 to Pl.'s Opp. to Mot. for Summ. J. at 3, ln. 17 (Mele Aff.). Mele states Marinik agreed to pay commissions to Stanton Sales for sales completed within three

---

[12] Such a written statement was provided to Mele on March 31, 2008, in which Tice and Marinik informed Mele that there were no outstanding orders for which he remained eligible to receive commission. Pl.'s Br. in Opp. to Summ. J. Ex. P-15, M-3.

[13] This Court is mindful of Mele's accusation that TSE deliberately delayed finalizing these sales in Order to deny him commissions. Mele, however, has not pointed to any evidence to support such a claim.

months of the termination date. He represents to the Court that "[t]his provision was placed in the Agreement and [is] supported by extrinsic evidence." Pl.'s Brief in Opp. to Summ. J. at 28. A careful reading of the Agreement attached to Mele's brief reveals no such provision. This Court speculates that Mele may have been referring to a provision placed in the Revised TSE Systems Inc. Manufacturers' Representative Agreement (Revised Agreement), redrafted in January 2008. The Revised Agreement contains a provision which states, "TSE will pay Representative commissions . . . for 60 days past the termination date . . . ." Revised Agreement at 6. The Revised Agreement's terms, however, are irrelevant because Mele was not a party to the Revised Agreement. Mele also suggests he is entitled to such commissions because of an industry standard for a phase-out period at the end of a contract.[14]

Mele's proffered "evidence" – an oral agreement between Mele and Marinik, a purported industry standard phase-out period, and a later-developed TSE Sales Representative's Agreement – does not alter this Court's interpretation of the Agreement, however, as Michigan law prohibits consideration of these items of extrinsic evidence. "Michigan's parol evidence rule bars the use of extrinsic evidence to contradict the terms of a written contract intended to be the final and complete expression of the contracting parties' agreement." *Wonderland Shopping Ctr. Venture L.P. v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1095 (6th Cir. 2001) (citations omitted); *see also Romska v. Opper*, 594 N.W.2d 853, 857 n.3 (Mich. Ct. App. 1999) ("The parol evidence rule excludes evidence of prior contemporaneous agreements, whether oral or written, which contradict, vary or modify an

---

[14] Mele has provided no expert testimony regarding this purported industry standard. Instead, he argues, "Since [he] assumed all the expenses of doing business and received no compensation until a sale [was] made, there is an industry standard for a phase out period at the end of a contract." Mele Aff. at 4.

unambiguous writing intended as a final and complete expression of the agreement."). Because this Court has found the language of the Agreement is unambiguous, no parol evidence will be considered as long as "the parties intended the written instrument to be a complete expression of their agreement as to the matters covered." *Cook v. Little Caesar Enters.*, 210 F.3d 653, 656 (6th Cir. 2000). The Michigan Court of Appeals explains:

> When the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidates the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'

*UAW-GM*, 579 N.W.2d at 418 (citations omitted); *see also Dominion Midwest Energy v. Mich. Pub. Serv. Comm'n*, No. 280391, 2009 Mich. App. LEXIS 2271 (Mich. Ct. App. Oct. 27, 2009) (holding an integration clause is conclusive evidence that a contract is the final expression of the contracting parties' intent).

Mele's Agreement with TSE contains such an integration clause immediately above the signature line, stating, "This Agreement and attachments cited herein represent the complete and entire commitment of the parties. Any modification of this Agreement must be negotiated and documented as a formal amendment thereof to be considered a part of this Agreement." Agreement at 6. Mele has not alleged this Agreement was procured through fraud.[15] This Court's further review of the Agreement reveal that it is not "obviously incomplete" so as to necessitate review of extrinsic evidence. *See UAW-GM*, 579 N.W.2d at 418. Therefore, this Court will not consider Mele's proffered extrinsic evidence that contradicts the terms of the Agreement. Thus, TSE is not obligated

---

[15] The beginning of the Agreement also states "The parties expressly agree that each of them is independent from the other and that this Agreement has been fairly negotiated." Agreement at 1.

to pay Mele commissions for the Merck & Co., Novartis, or LAB Research Sales under the Agreement's terms.[16]

Mele next argues he is entitled to further, unspecified commissions "for sales within the Territory made by non-Plaintiff representatives." Compl. ¶51. He contends "Stanton Sales was to receive commissions on all sales in the stated territory whether or not they had a hand in the closing." Pl.'s Br. at 6. Mele argues he and TSE both "understood" that Stanton Sales was entitled to commissions on all sales within its territory, regardless of the conflicting language of the contract. *Id.* at 17. TSE contends it has no responsibility to pay Mele for sales in which he was not the primary or sole salesperson, abased on the plain language of the Agreement.

The Agreement between Mele and TSE provides, "TSE shall pay to Representative a commission of 10% in US dollars based upon the net invoice value of all shipments of Products . . . to accounts whose 'bill to' address is within Territory and Representative is the primary or sole party responsible for achieving the sales." Agreement at 2. Mele argues this language is ambiguous in light of another term in the contract which provides for commission splitting between two sales representatives working from different territories. This provision reads:

> Commissions paid for sales to accounts with 'bill to' addresses outside Territory shall be determined on a case-by-case basis. In the event that Representative makes a sale at a customer location (most probably a HQ location) in his/her territory for a system that is installed in another Representative's territory it is TSE's intention to compensate both Representative's [sic] fairly. It would be customary to split the commission 75/25 between the Representative who made

---

[16] Furthermore, as discussed more fully below, even if such sales were completed before Mele's termination, he is still not eligible for commissions on those sales because he has not alleged he was the sole or primary party responsible for achieving such sales. Rather, he alleges he was the initial point of contact for the Merck & Co. sale, a prior salesman involved with Novartis, but involved with the Novartis sale, and that he had initial involvement with the LAB Research sale, but was not involved in negotiating or finalizing the sale or its terms.

>   the actual sale and the one who would inherit the customer's location where the installation occurs.

Agreement at 2. Mele's argument as to how this paragraph creates an ambiguity is perplexing. He seems to suggest the compensation provision, which provides for a 10% commission to representatives who act as the primary party responsible for a sale, only applies if two or more sales Representatives work on the sale.[17]

Terms of a contract are ambiguous only when the language is "reasonably susceptible to more than one interpretation." *Rinke*, 573 N.W.2d at 346. "If no reasonable person could dispute the meaning of ordinary and plain contract language, the court must accept and enforce the language as written." *Encompass Ins., Inc.*, 2009 U.S. Dist. LEXIS 4113, at *34. The Agreement states, if Mele is the "primary or sole party responsible for achieving" a sale, he is entitled to 10% commission. Agreement at 2. Mele contends he is entitled to commission on all sales within his territory, whether he was involved in the sale or not. The plain terms of the Agreement do not support this suggested interpretation.

Mele argues in the alternative that, if this Court does not find Mele is entitled to commissions on sales within his territory on which he did not work, or on which he only minimally worked, he should be treated by this Court as the de facto exclusive salesperson for his territory, and, by extension, the de facto sole party responsible for all sales within the territory. The Agreement,

---

[17] Mele's brief in opposition to TSE's Motion for Summary Judgment states, "[t]here is a provision of the Agreement which superficially suggests that the Representative is entitled to a commission only if he is primarily responsible for the sale. This language is only applicable in the event that two or more entities are responsible for a sale . . . . This language is only applicable if there is more than one Representative entitled to a commission. For example, the Agreement allows for splitting of a commission if a Representative in one territory makes a sale in another territory. The Agreement allows the commission to be split on a 75%/25% basis." Pl.'s Br. at 19.

14

however, states Mele was appointed as a "non-exclusive sales commission representative" of TSE products. Agreement at 1. By signing the Agreement, Mele agreed he was obligated to act as "the primary, but not exclusive, interface with the customers for purposes of developing, securing and servicing the sale of Product at accounts in the Territory." Agreement at 4. This Court again finds the plain language of the Agreement is not ambiguous, and is subject to no other reasonable interpretation but that Mele was not an exclusive sales commission representative.[18] Additionally, in Michigan, "an intent to give an agent an exclusive right to sell must appear from the unequivocal terms of the agreement or by necessary implication." *Roberts Assoc., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 656 (E.D. Mich. 1990). This Court finds the unequivocal terms of the Agreement establish that Mele is a non-exclusive sales person.

Mele continues his de facto exclusivity argument by asserting that, because he was unaware of other sales Representatives within his territory, all sales commissions must logically belong to him. In support of this, Mele contends he was entitled to notification if TSE hired additional Representatives in his territory, but he never received such notification. The Agreement states, "[A]s a courtesy, TSE agrees to provide 60-days' notice to Representative of its intentions to add additional sales representatives in the territory to allow for coordination of changes." Agreement at 2. TSE concedes it never provided such notification to Mele and that Mele was the only outside representative in the Territory for the bulk of the parties' agreement. TSE argues, however, that it maintained the right to have an interior sales force, based in Michigan, who responded to customer inquiries nationwide and finalized customer sales, in Mele's territory and elsewhere. Two provisions

---

[18] TSE, GmbH's chairman of the board, Jens-Uwe Engler (Engler), testified that if Mele wanted to be an exclusive salesperson in the region, he would have been subject to extra conditions, including a requirement that he guarantee a certain level of sales each year. Engler Dep. Tr. at 14.

of the Agreement confirm TSE's reservation of the right to independently contact its clients. The first is the line in which Mele agreed "to be the primary, but not exclusive, interface with the customers for the purposes of developing, securing and servicing the sale of Products at accounts in the territory." Agreement at 4. Additionally, under the "Representatives Obligations" heading, Mele agreed to "[p]ermit TSE to contact accounts for managing administrative functions, to provide sales or technical support as mutually agreed with Representative." Agreement at 4, ¶ I. This Court finds that, under the plain language of the Agreement, and regardless of whether other representatives worked within the Territory, Mele was a non-exclusive sales representative. In light of this unambiguous language, this Court will not accept Mele's suggestion to treat him as a de facto exclusive Representative.

In another attempt to seek commission payments for sales in which he had no involvement, Mele suggests he should be entitled to commission on all sales within his territory because of the original compensation system in place when he began performing his contract with TSE. The Agreement included a term in which Mele was eligible for a 5% commission on sales "[f]or customers that TSE has provided a formal quotation but not yet an Order Confirmation" if Mele "contributed bona fide efforts to close the sale." Agreement at 3. The Agreement, however, limited this original compensation scheme to the period between March 31, 2005, and March 31, 2006.[19] Agreement at 3. Thus, Mele's argument this compensation scheme should continue past this date is meritless.

Mele also argues his discussions with TSE's President, James Marinik, led him to believe

---

[19] The Agreement states, "The period for which this condition applies will be from the beginning of the agreement through the last day of TSE's fiscal year (March 31, 2006)." Agreement at 3.

he would be the exclusive sales person in the region and is therefore entitled to commissions on all sales within his region. In support, Mele offers his own testimony regarding his understanding of the Agreement, testimony of his sales partner at Stanton Sales, and an exclusive sales agent agreement between TSE and a salesman in India, among other things. Mele again asks this Court to consider extrinsic evidence to modify the terms of the Agreement. Under Michigan law, this Court cannot consider such parol evidence as the terms of the Agreement are clear and unambiguous. *See Romska*, 594 N.W.2d at 857 n.3.

Having determined TSE did not breach the Agreement by failing to compensate Mele for sales which were finalized after his termination date or sales for which he was not the sole or primary sales representative involved, this Court next considers Mele's claims regarding other alleged contractual breaches. Mele first argues TSE breached the Agreement every time a TSE employee contacted someone within Mele's territory directly to negotiate prices or finalize sales contracts. As an example of this action, Mele cites a sale to Harvard University in which he was forced to lower his price – and therefore received a lower commission– after a TSE representative quoted a lower price to the University.

The Agreement states, "Representative shall have no authority to bind TSE in any respect whatsoever. Orders obtained by Representatives for TSE products shall be in full accordance with the standards, pricing or quotations and terms and conditions of sales established by TSE." Agreement at 1. The Agreement further addresses the situation in which a TSE client is offered a reduced sales price on TSE equipment, and notes that a representative's commission is reduced when a sales discount is given. The Agreement states, "For instances in which the final selling price is below list price, a reduced commission will be paid to reflect a sharing of the reduction in income

17

to both TSE and Representative." Agreement at 2. Addendum C to the agreement establishes commission scales for less-than-list pricing. A plain reading of the language of the contract shows that both parties contemplated, and agreed, to permit TSE's offer of reduced sales prices and the concomitant reduction of commissions.[20]

Mele next contends TSE breached the Agreement by implementing a new commission reporting system. In September 2007, TSE told Mele it was no longer acceptable to report sales by phone or email. Instead, TSE told Mele that he would only receive commission payments if he completed a newly-created documentation form and used an online Customer Relations Management (CRM) program in connection with his sales activity. Mele refused. While Mele argues implementation of the reporting system was a contractual breach, he does not point to a provision in the Agreement which mandates a specific method of reporting commissions. This Court finds nothing in the contract which conflicts with TSE's ability to initiate such a reporting system.

Furthermore, a breach of contract can only be found where such breach is of a material term of the contract. A material breach occurs "where a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, [or] the breach substantially defeats the contract's purpose," or the breach is vital to the existence of the contract. *Hodak v. Madison Capital Mgmt.*, 348 Fed. Appx. 83, 90 (6th Cir. 2009). An alteration in such method does not change the circumstances in which Mele is eligible for commission or the amount of commission payment, it

---

[20] Mele alleges that at a company meeting Engler asserted TSE, GmbH needed to allow the representatives to be the main point of contact for TSE to succeed and Engler himself needed to stop circumventing the representative by making contact with customers. Even if the Court assumes this is true, TSE's or Engler's statements are reflective only of a company policy goal and do not impact the language of the Agreement. This Court therefore finds TSE did not breach the Agreement by directly contacting customers within Mele's territory.

is only a change in the method of reporting commission-eligible sales. An alteration in the commission reporting method does not substantially defeat the contract's purpose, nor is the method of reporting vital to the contract's existence. Thus, the method of reporting commissions is not an essential term or condition of the Agreement and this Court finds TSE did not violate the Agreement by implementing the CRM reporting system.

Mele finally argues TSE breached the Agreement by failing to provide all leads for potential sales within his territory and by placing an inside sales force in the region without providing adequate notice to Mele. Mele, however, fails to identify any leads which he believes were improperly withheld from him and which ultimately resulted in a sale of TSE products. He also has provided no evidence to support his claim that TSE placed inside sales representatives in the region.[21] At the summary judgment stage, "[d]efendants are not required to produce any evidence to disprove [a plaintiff's] claims." *Chires v. Cumulus Broad, LLC*, 543 F. Supp. 2d 712, 721 (E.D. Mich. 2008). Rather, "[a plaintiff] has the burden to produce evidence that establishes a genuine issue of material fact." *Id.* By failing to introduce evidence which supports his allegations against TSE, Mele has failed to "designate specific facts showing that there is a genuine issue for trial" on these issues. *See Celotex Corp.*, 477 U.S. at 323. Because Mele cannot survive summary judgment on his breach of contract claims, summary judgment will be entered in favor of TSE.

An appropriate order follows.

---

[21] Mele attached a series of e-mails between Marinik and Engler from February 2007 in which the two discussed hiring an individual to fill an inside sales position. These e-mails discuss potential candidates, and debate whether TSE should conduct independent interviews or use a recruiting firm to find a suitable candidate for a sales position. The e-mails do not, however, reveal that any independent sales representative was hired by TSE, or that such representative was placed in Mele's territory. Pl.'s Br., Ex. P-18.